# CIVIL COVER SHEET (JS 44)

| Plaintiff: | Jose Louis Santiago |
|---|---|
| Defendants: | City of Philadelphia; Estate of Hon. Paul Ribner; David Desiderio, Esq. |
| County of Residence (Plaintiff): | Philadelphia |
| County of Residence (First Listed Defendant): | Philadelphia |
| Civil Action No.: | _____ |

**Basis of Jurisdiction:** 28 U.S.C. § 1331; 42 U.S.C. §§ 1983, 1985
**Nature of Suit:** 440 Civil Rights; 442 Employment; 950 Constitutional Law (as applicable)

**Origin:** Original Proceeding
**Cause:** Action brought under 42 U.S.C. § 1983 for wrongful conviction, due process violations, conspiracy, Monell liability
**Requested Relief:** Compensatory damages, punitive damages, injunctive relief, attorney appointment
**Jury Demand:** YES (as pleaded in Complaint)

**Attorney for Plaintiff:** Plaintiff proceeding pro se
Name: Jose Louis Santiago
Address: 6425 Hegerman Street, Philadelphia, PA 19135
Phone: +1 (267) 213-6164

Date: 12 - 03 - 25
Signature of Plaintiff: *Jose L. Santiago*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE LUIS SANTIAGO,
Plaintiff, pro se,

REC'D DEC - 3 2025

v.

CITY OF PHILADELPHIA, et al.,
THE ESTATE OF THE HONORABLE PAUL RIBNER,
DAVID DESIDERIO, ESQ.,

Defendants.

CIVIL ACTION NO. _____

JURY TRIAL DEMANDED

COMPLAINT

(42 U.S.C. § 1983, § 1985, and Related State-Law Claims)

Plaintiff, Jose Luis Santiago, appearing pro se, alleges as follows:

I. PRELIMINARY STATEMENT

1. For more than thirty years, Jose Luis Santiago has maintained, steadfastly and without wavering, that he is innocent of the murder of Denise Gilmore. He has never admitted to orchestrating a drive-by, never admitted to sharing any intent to kill, and even in the face of a life-without-parole sentence, he has maintained that he did not commit first-degree murder and did not possess a specific intent to kill anyone.

2. In late August 1992, on the streets of North Philadelphia, shots were fired from a moving car. The Commonwealth's theory was that Mr. Santiago was the driver; that an

unidentified shooter in the back seat aimed at a man named Afon Singleton; and that, instead of killing the intended target, one bullet struck Ms. Gilmore, who was outside her house and tragically died from a single wound. From that single, terrible event, the Commonwealth constructed a capital case.

3. What followed was not the kind of trial contemplated by the Sixth and Fourteenth Amendments. Mr. Santiago was forced to choose between a capital jury and a non-capital bench trial without knowing that the judge who would sit in judgment of him—The Honorable Paul Ribner—was quietly aligned with the trial prosecutor, Assistant District Attorney David Desiderio, through a personal accident in which Desiderio stood to be a favorable eyewitness in the judge's civil lawsuit.

4. Months before Mr. Santiago's trial, Judge Ribner and his wife were involved in a car accident. Desiderio personally witnessed the collision, approached the judge's vehicle, checked on him and his wife, and thereby became a critical eyewitness for any civil action arising from that accident. Court records and public dockets indicate that this was not the first, nor the last, time Judge Ribner pursued personal-injury litigation; the Rosen matter sits among several injury lawsuits he filed both before and after that incident, underscoring that he was no stranger to maximizing civil recovery when he believed he had a viable claim.

5. In other criminal cases following the accident—including the capital case of Commonwealth v. Christopher Williams, tried approximately one month before Mr. Santiago's trial—Judge Ribner disclosed on the record that Desiderio had been a witness to the accident and that a civil lawsuit might be pursued. Those defendants were given a meaningful choice: proceed with the judge or seek his recusal.

6. Mr. Santiago was never given that choice. In his case, the judge and prosecutor said nothing. At the exact moment when Mr. Santiago was asked to waive his jury-trial right in a capital case, the truth about the judge-prosecutor relationship was withheld. He was told only that the Commonwealth would pursue death if he insisted on a jury, and that the Commonwealth would drop death if he agreed to a bench trial before Judge Ribner.

7. In that high-pressure setting, Mr. Santiago was told by the judge that, to convict him of first-degree murder, the court would have to find that he specifically intended to kill Ms. Gilmore. No one informed him that under the doctrine of transferred intent, he could be convicted even if she was not the intended victim. No one explained that the law could be applied in that way. Mr. Santiago relied on what he was told. Believing that the Commonwealth could not prove specific intent as to Ms. Gilmore, and believing that a judge would faithfully apply the law, he waived his jury-trial right in favor of a bench trial.

8. Mr. Santiago has always maintained that had he known the full truth—that his trial judge was contemplating or intending to sue over a car accident in which his prosecutor was a key eyewitness, that other defendants were being informed of this conflict and allowed to seek recusal, and that the law of transferred intent could be deployed against him—he never would have waived his right to a jury of his peers. He would have chosen twelve citizens over a single conflicted judge.

9. At trial, a set of impeached criminal witnesses—drug users and sellers with prior convictions and inconsistent statements—were nevertheless credited by Judge Ribner. By contrast, Mr. Santiago's defense witnesses, including his alibi, were aggressively discredited. But for Judge Ribner's bias, and his unspoken incentive to maintain favor

with Desiderio in light of their concealed accident relationship and the judge's pattern of pursuing personal injury lawsuits, there is every reason to believe that a properly instructed, unbiased jury of Mr. Santiago's peers could have acquitted him or, at minimum, rejected first-degree murder.

10. In closing arguments, the problem of intent surfaced in the open. As reflected by the record, even Judge Ribner acknowledged concern about whether the evidence proved a specific intent to kill Ms. Gilmore. Desiderio, rather than invoking "transferred intent," suggested other ways to think about first-degree liability. The phrase "transferred intent" did not cross anyone's lips during the waiver colloquy or during closings. It would appear only later—after Mr. Santiago filed post-trial motions challenging the sufficiency of the evidence—when Desiderio, in his written response, for the first time articulated a transferred-intent theory. In his subsequent Rule 1925(a) opinion, Judge Ribner essentially copied and adopted Desiderio's belated reasoning to preserve the conviction on appeal.

11. Decades later, in post-conviction proceedings, the conflict came to light. In 2019, attorney Lee Mandell, who had represented Christopher Williams, confirmed in writing that in Williams's case Judge Ribner disclosed the accident and Desiderio's role as a witness. Armed with this "newly discovered evidence," Mr. Santiago sought relief. In 2024, the PCRA court agreed: the conflict involving the accident and the judge–prosecutor relationship was so serious that it vacated Mr. Santiago's conviction and sentence and granted him a new trial.

12. On that same day, after Mr. Santiago had spent roughly thirty-two years in prison, the Philadelphia District Attorney's Office offered him a plea bargain: plead guilty to third-

4

degree murder in exchange for a sentence of 32½ to 65 years. Although this sentence exceeded the 40-year maximum applicable at the time of the 1992 offense, the agreement ensured his immediate release on parole. Still maintaining his innocence, and faced with the risk of further incarceration pending retrial, Mr. Santiago accepted the plea to regain his freedom.

13. Mr. Santiago now brings this pro se civil action under 42 U.S.C. §§ 1983 and 1985, and under Pennsylvania law, seeking redress for: (a) deprivation of liberty without due process and denial of a fair trial; (b) malicious prosecution and wrongful conviction; (c) extraordinary judicial and prosecutorial misconduct, including unlawful manipulation of his jury-trial rights; (d) conspiracy; (e) municipal and supervisory liability; and (f) state-law intentional infliction of emotional distress and false imprisonment.

14. He does so not as a man who has ever confessed guilt, but as a man who has maintained his innocence from the day of his arrest through the present, and who contends that but for the concealed conflict of interest and the bias that flowed from it, he would likely have been acquitted by a jury of his peers.

15. Plaintiff seeks compensatory damages of $2,016,000.00, punitive damages of $6,500,000.00, and declaratory, injunctive, and equitable relief sufficient to recognize the wrongs done, to compensate him for his stolen decades, and to deter similar misconduct in the future.

## II. JURISDICTION AND VENUE

16. This action arises under the Constitution and laws of the United States, including 42

U.S.C. §§ 1983, 1985, and 1988, and the Sixth and Fourteenth Amendments to the United States Constitution. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4). The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred within the Eastern District of Pennsylvania and all Defendants reside in, or are deemed to reside in, this District.

## III. PARTIES

18. Plaintiff Jose Louis Santiago is an adult United States citizen residing at 6425 Hegerman Street, Philadelphia, Pennsylvania. He is a formerly incarcerated individual whose 1993 first-degree murder conviction was vacated and who, to this day, maintains his innocence of first-degree murder and any intent to kill. Plaintiff appears pro se.

19. Defendant City of Philadelphia ("City") is a municipal corporation organized under Pennsylvania law, with its principal offices at 1515 Arch Street, Philadelphia, Pennsylvania. At all relevant times, the City supervised and operated the Philadelphia District Attorney's Office and maintained policies, practices, customs, and usages that were the moving force behind the constitutional violations described herein.

20. Defendant Estate of the Honorable Paul Ribner ("Estate"), by and through Executrix The Honorable Doris A. Smith-Ribner, whose address is 11508 Glen Road, Potomac, MD 20854, is sued for the acts and omissions of the late Judge Ribner while acting under color of state law as a judge of the Court of Common Pleas of Philadelphia County in Mr. Santiago's

criminal proceedings. Public docket records show that Judge Ribner, over the years, filed multiple personal-injury lawsuits—including but not limited to the Rosen matter—underscoring that he had an ongoing pattern of litigating his own injury claims.

21. Defendant David Desiderio, Esq. ("Desiderio") is a former Assistant District Attorney for the City of Philadelphia, who prosecuted Mr. Santiago's case and numerous other homicide cases. His business address is 2 Bala Plaza, Suite 300, Bala Cynwyd, Pennsylvania 19004. He is sued in his individual and official capacities.

## IV. FACTUAL ALLEGATIONS

### A. The Shooting and Allegations Against Mr. Santiago

22. On or about August 25–26, 1992, shots were fired from a vehicle near Amber and Berks Streets in Philadelphia. The Commonwealth alleged that Mr. Santiago was the driver of that vehicle and that an unidentified shooter in the back seat aimed towards Afon Singleton, with whom Mr. Santiago allegedly had a drug-related dispute.

23. One of the bullets struck and killed Denise Gilmore, who was outside near her home. Another bullet wounded Joseph Martin. No one contended that Ms. Gilmore was the intended target.

24. From his arrest, throughout his trial, and through decades of incarceration, Mr. Santiago has maintained that he did not plan, direct, or participate in a drive-by shooting, that he did not share any intent to kill Singleton or anyone else, and that he is innocent of first-degree murder.

25. The Commonwealth's case depended heavily on eyewitnesses who claimed to recognize Mr. Santiago as the driver of a moving car despite heavily tinted windows and poor viewing conditions. These witnesses had criminal histories, including drug convictions and crimes of dishonesty, and had made prior inconsistent statements. They were impeached at trial on these grounds.

## B. The Undisclosed Accident and Conflict of Interest

26. Several months before Mr. Santiago's trial, Judge Paul Ribner and his wife were involved in a car accident in front of Philadelphia City Hall involving a driver later identified as Heather E. Rosen.

27. ADA Desiderio, riding in a separate vehicle with other prosecutors, witnessed the accident. He exited his car, approached Judge Ribner's vehicle, and asked the judge and his wife whether they were alright. In doing so, he positioned himself as an eyewitness to a potential personal-injury lawsuit arising from that accident.

28. Desiderio later acknowledged, in post-conviction testimony, that he recalled multiple trials after the accident in which Judge Ribner informed defendants and counsel that Desiderio had been a witness to the accident and that a civil lawsuit might be filed.

29. In one such case—Commonwealth v. Christopher Williams—a capital homicide case tried approximately one month before Mr. Santiago's trial—Judge Ribner disclosed in open court that Desiderio had been a witness to his accident and that litigation could ensue. Williams, represented by attorney Lee Mandell, elected to proceed with Judge Ribner after

that disclosure and was convicted by a jury.

30. In Mr. Santiago's case, however, no such disclosure was made—before, during, or after trial. Neither Mr. Santiago nor his trial counsel, Daniel Alva, was informed that Desiderio was a potential or actual civil witness in a case in which Judge Ribner would later file suit and recover on a claim. Court records indicate that the Rosen lawsuit fit within a broader pattern of personal-injury litigation by Judge Ribner, making Desiderio's role as a favorable eyewitness all the more significant to the judge.

31. Under long-established due-process principles, the neutrality of the trial court is non-negotiable. A judge with a personal interest—especially a financial interest tied to the cooperation and testimony of a prosecutor—must at minimum disclose that conflict so that the defendant can seek recusal or make an informed choice. Mr. Santiago was denied that basic protection.

32. Mr. Santiago maintains that had he known of the accident, of Desiderio's role as a witness, and of the judge's intent to pursue a civil lawsuit within the two-year limitations period, he would have never consented to a bench trial, particularly in a capital case. He would have insisted on his right to a jury and sought recusal.

C. Capital Exposure and the Jury-Waiver Colloquy

33. On September 20, 1993, immediately prior to trial, Mr. Santiago appeared before Judge Ribner for pre-trial proceedings. The Commonwealth, through Desiderio, announced that it was pursuing the death penalty based on the first-degree murder charge.

34. Mr. Santiago was told that if a jury found him guilty of first-degree murder, he could be sentenced to death or life without the possibility of parole. He was further told that the Commonwealth would agree not to pursue the death penalty only if he waived his right to a jury trial and proceeded with a bench trial before Judge Ribner.

35. During the on-the-record colloquy, Judge Ribner explained that to convict Mr. Santiago of first-degree murder, he would have to find that Mr. Santiago had a specific intent to kill Ms. Gilmore. The judge did not mention the doctrine of transferred intent, did not explain it, and did not inform Mr. Santiago that he could be convicted of first-degree murder even if the intended target was someone else.

36. Relying on what the judge said, and on counsel's advice grounded in that limited explanation, Mr. Santiago believed that because Ms. Gilmore was not the intended target, and because he was not the shooter, the Commonwealth could not prove specific intent as to her. As a result, he believed that a judge, trained in the law, would recognize this legal defect and acquit him of first-degree murder.

37. Under relentless pressure, facing the terrifying prospect of a capital sentencing hearing if convicted by a jury, and unaware of the judge-prosecutor conflict and the judge's personal history of leveraging injury lawsuits, Mr. Santiago waived his right to a trial by jury. He did so in reliance on a partial and misleading legal explanation and in the dark about a conflict that would have given any reasonable defendant pause.

38. Mr. Santiago maintains that his waiver was not knowing, voluntary, or intelligent. Had he known the full legal landscape, and the full nature of the judge's relationship with the prosecutor, he would have chosen a jury.

**D. The Bench Trial: Impeached Witnesses Credited, Defense Witnesses Discredited**

39. At trial, the Commonwealth's eyewitnesses were individuals with serious credibility issues: prior drug convictions, prior crimen falsi convictions, and inconsistent prior statements. All of these weaknesses were developed on cross-examination. Yet, despite these impeachment points, Judge Ribner credited these witnesses and relied on them to find that Mr. Santiago was the driver.

40. Mr. Santiago presented defense witnesses, including an alibi witness, whose testimony contradicted the Commonwealth's account and supported his innocence. These witnesses were, from early in the trial, treated with skepticism and disdain. Their testimony was discounted by both Desiderio and the court in ways that signaled bias rather than careful adjudication.

41. In a particularly prejudicial episode, Desiderio elicited testimony about Mr. Santiago's prior drug convictions. When a defense witness described Mr. Santiago as a "fuzzy-lovable teddy bear," Desiderio asked if it would surprise her to learn that he had been convicted of drug dealing several times. Defense counsel objected and moved for a mistrial.

42. Although the court sustained some objections, Judge Ribner allowed the thrust of the improper character evidence to stand: that Mr. Santiago was a multi-time drug dealer who "ran" a corner. Desiderio never tied the prior convictions to the precise location or event at issue; the only purpose of this testimony was to inflame the fact-finder.

43. Mr. Santiago contends that this acceptance of tainted prosecution witnesses and rejection of defense witnesses was not neutral fact-finding. It was the predictable result of a bench trial before a judge who was, whether consciously or not, inclined to favor a prosecutor who might later serve as a favorable witness in his personal civil suit and who had a documented history of pursuing such injury suits.

44. Mr. Santiago has always maintained his innocence, and he contends that a jury of his peers, properly instructed and untainted by the concealed judge–prosecutor relationship, could have rejected the strained prosecution narrative built on impeached witnesses and improper character evidence.

E. Closing Arguments and the Problem of Intent

45. During closing arguments, the issue that had lurked beneath the surface—specific intent to kill Ms. Gilmore—came to the fore. Even Judge Ribner, in remarks reflected by the record, expressed concern about whether the evidence supported a first-degree murder conviction given the lack of direct proof that Mr. Santiago intended to kill Ms. Gilmore.

46. At that critical moment, Desiderio did not mention "transferred intent." He did not urge the judge to apply that doctrine as a way to bridge the gap between the intended target (Singleton) and the tragic victim (Ms. Gilmore). Instead, he argued other theories and angles to support first-degree liability.

47. The record thus reflects a closing argument and judicial concern focused on specific intent to kill Ms. Gilmore, with no invocation of transferred intent as the operative legal doctrine. Mr. Santiago, still maintaining his innocence, listened to a discussion

that mirrored the colloquy he had been given: first-degree murder required proof of intent to kill Ms. Gilmore.

48. It was only later—after Mr. Santiago filed post-trial motions challenging the sufficiency of the evidence on intent—that Desiderio, in his written response to Defendant's Post-Trial Motions, first articulated a doctrine of transferred intent as the legal basis for liability. That written response was the first time the Commonwealth formally took the position that the bullets' striking an unintended victim could support a first-degree conviction for Ms. Gilmore's death.

49. In his subsequent Rule 1925(a) opinion, Judge Ribner essentially adopted and echoed Desiderio's reasoning, stating that Mr. Santiago had been convicted under transferred intent. The logic and language of the opinion tracked the prosecutor's post-hoc articulation, giving every appearance that the judge had retrofitted his rationale to preserve the conviction on appeal rather than faithfully applying the law he himself had set out during the waiver colloquy and closing.

F. Post-Trial Proceedings, Discovery of the Conflict, and PCRA Relief

50. Mr. Santiago's conviction and life-without-parole sentence were affirmed on direct appeal. For decades, he continued to maintain his innocence and to challenge his conviction through post-conviction filings.

51. In 2019, while still incarcerated, Mr. Santiago wrote to multiple attorneys in Philadelphia seeking help. One of those attorneys, Lee Mandell, responded and informed Mr. Santiago that in the Christopher Williams case, Judge Ribner had disclosed that Desiderio

was a witness to his car accident and that a civil action might be filed. This was the first time Mr. Santiago learned of the accident and the judge-prosecutor relationship.

52. Mr. Santiago promptly filed a pro se PCRA petition based on this newly discovered evidence. Attorney Todd Mosser later entered the case, investigated further, and located the civil docket reflecting that Judge Ribner filed a lawsuit against Heather Rosen on April 18, 1995, and that the case was marked settled in December 1995—within the two-year statute of limitations. Those same civil records also revealed that the Rosen lawsuit was one of several personal-injury cases brought by Judge Ribner over the years, further highlighting the importance of favorable eyewitnesses like Desiderio to his ongoing civil litigation efforts.

53. In PCRA proceedings, Desiderio testified that he saw the accident, approached the judge's car, and recalled that in other cases he tried before Judge Ribner, the judge disclosed this fact to defendants and counsel. Yet the record in Mr. Santiago's case contains no such disclosure. The omission is stark: others were told; Mr. Santiago was not.

54. The PCRA court ultimately concluded that the undisclosed conflict and the appearance of impropriety arising from the accident and Desiderio's role as a potential civil witness violated Mr. Santiago's structural due-process rights. The court vacated his conviction and sentence and granted him a new trial.

55. On the same day, the Commonwealth offered Mr. Santiago a plea bargain to third-degree murder with a sentence of 32½ to 65 years—a sentence that exceeded the 40-year maximum for third-degree murder at the time of the 1992 offense, but which allowed his immediate

release on parole after more than three decades in prison.

56. Still maintaining his innocence but faced with the risk and delay of retrial, Mr. Santiago accepted the plea to secure his freedom. He was released in October 2024.

G. Pattern and Practice: Desiderio and the City of Philadelphia

57. Mr. Santiago's ordeal did not occur in isolation. Former ADA Desiderio has been named in multiple civil rights lawsuits alleging Brady violations, use of lying informants, fabrication of evidence, and wrongful convictions. Several convictions tied to his prosecutions have been overturned, and exonerated individuals have obtained substantial civil settlements.

58. These cases, together with reports of systemic prosecutorial misconduct in Philadelphia, demonstrate a pattern: a culture in which constitutional violations were tolerated, where prosecutors were not meaningfully disciplined for Brady violations or conflicts of interest, and where the City failed to implement structural reforms.

59. It was against this backdrop that Mr. Santiago's case unfolded. The concealed conflict between judge and prosecutor, the manipulation of his jury waiver, and the after-the-fact transferred-intent rationale were not random missteps; they were manifestations of a system whose policymakers allowed such behavior to develop and persist.

H. Continuing Harm and Mr. Santiago's Maintained Innocence

60. As a direct and foreseeable result of Defendants' conduct, Mr. Santiago lost

approximately thirty-two years of his life to incarceration on a conviction now vacated for structural constitutional error. He lived every one of those days maintaining his innocence, refusing to confess to something he insists he did not do.

61. Mr. Santiago suffers severe and continuing emotional distress—trauma from decades in maximum-security custody; the pain of separation from family; the stigma of a murder conviction; and the ongoing challenge of rebuilding his life as a middle-aged man with a criminal record he contends was born of a corrupted trial.

62. He maintains, now as then, that he did not intend to kill Ms. Gilmore, did not intend to kill anyone, and that if a jury of twelve citizens had heard his case without the distorting influence of a conflicted judge and a compromised process, he could have been acquitted.

## V. MONELL ALLEGATIONS – CITY OF PHILADELPHIA

63. At all relevant times, the City of Philadelphia, through its final policymakers, including the District Attorney and senior supervisory officials, maintained policies, practices, customs, and usages that were the moving force behind Mr. Santiago's injuries.

64. These policies and customs included, but were not limited to:

a. A pattern and practice of failing to disclose exculpatory and impeachment evidence in violation of Brady v. Maryland;

b. A culture that rewarded high conviction rates and tolerated the use of unreliable

witnesses, coerced testimony, and after-the-fact rationalizations of legal theories;

c. Failure to train and supervise prosecutors regarding conflicts of interest, including situations where a prosecutor is a witness to a judge's personal litigation;

d. Failure to implement effective supervisory systems to detect and prevent structural due-process violations, particularly in capital and homicide prosecutions; and

e. Failure to discipline, retrain, or meaningfully sanction prosecutors like Desiderio after judicial findings, exonerations, or civil litigation exposed patterns of misconduct.

65. The City's deliberate indifference to these problems made Mr. Santiago's wrongful conviction and prolonged imprisonment substantially likely and, in practical terms, inevitable.

## VI. CAUSES OF ACTION

COUNT I

42 U.S.C. § 1983 – Deprivation of Liberty Without Due Process and Denial of a Fair Trial (Against All Defendants)

66. Plaintiff incorporates by reference paragraphs 1–65.

67. Defendants, acting under color of state law, deprived Mr. Santiago of his right to a fair trial and due process of law by:

a. Concealing the conflict and appearance of impropriety arising from Judge Ribner's accident and Desiderio's role as a potential civil witness;

b. Orchestrating a capital jury-waiver colloquy that omitted critical legal doctrines (transferred intent) and misled Mr. Santiago about the nature of first-degree murder liability;

c. Conducting a bench trial before a judge whose neutrality was compromised and whose bias favored the prosecution; and

d. Retroactively justifying the conviction through a post-hoc transferred-intent rationale not disclosed at the time of waiver or closing arguments.

68. These actions violated clearly established due-process principles requiring an impartial tribunal and a knowing, voluntary, and intelligent waiver of fundamental rights.

69. As a direct and proximate result, Mr. Santiago was wrongfully convicted of first-degree murder, sentenced to life without parole, and imprisoned for approximately thirty-two years, despite maintaining his innocence throughout.

**COUNT II**

**42 U.S.C. § 1983 – Malicious Prosecution and Wrongful Conviction**

**(Against Desiderio, the Estate of Judge Ribner, and City of Philadelphia)**

70. Plaintiff incorporates by reference paragraphs 1–69.

71. Desiderio initiated and continued criminal proceedings against Mr. Santiago without probable cause to believe that he possessed a specific intent to kill Ms. Gilmore, and then retrofitted a transferred-intent theory in post-trial briefing to preserve a verdict that could not be sustained under the legal framework described at the time of waiver and trial.

72. Judge Ribner ratified and adopted these tactics by crediting impeached prosecution witnesses, discrediting defense witnesses, allowing improper prior-bad-acts evidence, and then embracing the new transferred-intent rationale in his Rule 1925(a) opinion.

73. The City, through its policies and customs, facilitated and ratified these actions, failing to train or supervise prosecutors and failing to enforce constitutional standards of practice.

74. Mr. Santiago's conviction has been vacated; his liberty interest has been restored to the extent that he is no longer under the original life-without-parole sentence. Nonetheless, he remains on parole under a plea he accepted solely to escape further wrongful incarceration.

75. Defendants' conduct satisfies the elements of malicious prosecution and wrongful conviction under § 1983 and proximately caused Mr. Santiago's injuries.

COUNT III

42 U.S.C. § 1983 – Structural Due-Process Violation and Unlawful Manipulation of Jury-Trial Rights

(Against Desiderio and the Estate of Judge Ribner)

76. Plaintiff incorporates by reference paragraphs 1–75.

77. Defendants deprived Mr. Santiago of his right to a jury trial and to structural due process by:

a. Conditioning the removal of the death penalty on his agreement to a bench trial before a conflicted judge;

b. Failing to disclose the accident, the judge's prospective civil suit, and Desiderio's role as a witness in that suit;

c. Omitting the doctrine of transferred intent from the jury-waiver colloquy, and then using it post-hoc to uphold the conviction; and

d. Conducting a trial in which the tribunal's impartiality was compromised from the outset.

78. These defects strike at the heart of the trial framework, not merely at isolated evidentiary rulings, and constitute structural error that cannot be cured by harmless-error analysis.

79. Mr. Santiago's waiver of his jury-trial right was not knowing, voluntary, or intelligent, and the bench trial that followed was fundamentally unfair.

COUNT IV

42 U.S.C. § 1983 – Failure to Intervene

(Against Desiderio and City of Philadelphia)

80. Plaintiff incorporates by reference paragraphs 1–79.

81. Desiderio knew that he had been a witness to Judge Ribner's accident, knew that the judge was disclosing this fact in other contemporaneous cases, and knew that this relationship created an appearance of impropriety.

82. Despite this knowledge, Desiderio failed to disclose the conflict in Mr. Santiago's case, failed to seek the judge's recusal, and failed to take any steps to protect Mr. Santiago's rights.

83. The City's policies and customs, including inadequate training and supervision concerning conflicts of interest, further contributed to this failure.

84. This failure to intervene allowed the structural due-process violation to occur and caused Mr. Santiago's injuries.

COUNT V

42 U.S.C. § 1983 – Municipal and Supervisory Liability (Monell)

(Against City of Philadelphia)

85. Plaintiff incorporates by reference paragraphs 1–84.

86. The constitutional violations visited on Mr. Santiago were not isolated acts; they

were the foreseeable outcome of the City's longstanding policies, customs, and deliberate indifference as described above.

87. By failing to implement effective training, supervision, and discipline regarding prosecutorial misconduct, Brady obligations, and conflicts of interest, the City effectively endorsed and enabled the conduct of Desiderio and others.

88. Under Monell, the City is liable for the constitutional injuries proximately caused by these policies and customs.

COUNT VI
42 U.S.C. § 1983 – Civil Rights Conspiracy
(Against Desiderio and the Estate of Judge Ribner)

89. Plaintiff incorporates by reference paragraphs 1–88.

90. Desiderio and Judge Ribner reached an understanding, tacit or explicit, to proceed with a bench trial and jury waiver in Mr. Santiago's case without disclosing their accident-related relationship, even while disclosing it in other cases.

91. Their coordinated actions—in which Desiderio offered to withdraw the death penalty if Mr. Santiago accepted a bench trial, the judge conducted a partial colloquy, and both later justified the conviction through a new transferred-intent theory—reflect a mutual agreement to secure Mr. Santiago's conviction in a forum tainted by conflict and bias.

92. This agreement and course of conduct constituted a conspiracy to deprive Mr. Santiago

of his constitutional rights.

## COUNT VII

42 U.S.C. § 1985(3) – Conspiracy to Deprive Equal Protection and Due Process
(Against Desiderio and the Estate of Judge Ribner)

93. Plaintiff incorporates by reference paragraphs 1–92.

94. On information and belief, the practices that ensnared Mr. Santiago—concealed
conflicts, manipulated waivers, tolerance for Brady violations—were disproportionately
imposed on poor, Black, and Latino defendants in Philadelphia, reflecting structural and
class-based bias in the criminal justice system.

95. By selectively providing conflict disclosures and recusal options to some defendants
(such as Christopher Williams) while denying them to Mr. Santiago, Defendants treated him
differently from similarly situated defendants and deprived him of equal protection and
equal due-process protections.

96. Mr. Santiago suffered injury as a direct and foreseeable result of this conspiracy.

## COUNT VIII

State-Law Claim – Intentional Infliction of Emotional Distress
(Against Desiderio, the Estate of Judge Ribner, and City of Philadelphia to the Extent
Permitted by Law)

97. Plaintiff incorporates by reference paragraphs 1–96.

98. Under Pennsylvania law, Defendants are liable for intentional infliction of emotional distress where their conduct is extreme and outrageous, undertaken with intent or reckless disregard, and causes severe emotional harm.

99. The conduct of Desiderio and Judge Ribner—concealing a personal conflict, pressuring a capital defendant into a bench trial before a compromised judge, manipulating the legal framework of first-degree liability, and preserving a conviction through after-the-fact rationalizations—was extreme and outrageous by any measure.

100. Defendants either intended to cause severe emotional distress or acted with reckless disregard of the near certainty that wrongfully convicting a man of first-degree murder and sentencing him to life without parole would cause profound psychological harm.

101. As a result, Mr. Santiago has suffered severe and continuing emotional distress, including anxiety, depression, trauma, and loss of life enjoyment. These harms are ongoing even after his release.

102. To the extent immunity doctrines are asserted, Plaintiff maintains that this intentional, malicious conduct falls outside any legitimate scope of official immunity.

COUNT IX

State-Law Claim – False Imprisonment

(Against Desiderio, the Estate of Judge Ribner, and City of Philadelphia)

103. Plaintiff incorporates by reference paragraphs 1–102.

104. Under Pennsylvania law, false imprisonment is the unlawful detention of a person without legal justification.

105. Defendants' actions—obtaining a conviction through a structurally defective bench trial before a conflicted judge, supported by a manipulated jury-waiver and after-the-fact legal rationalization—deprived Mr. Santiago of any lawful justification for his confinement under the original life-without-parole sentence.

106. The PCRA court's decision vacating his conviction and granting a new trial confirms that the original judgment was constitutionally invalid. Mr. Santiago's decades of confinement under that judgment therefore constitute false imprisonment as a matter of state law.

107. Mr. Santiago was aware at all times of his confinement and experienced it as a direct consequence of Defendants' actions.

108. Defendants are liable to Mr. Santiago for the time he was unlawfully imprisoned and for the resulting harms.

## VII. DAMAGES

109. Plaintiff seeks:

a. Compensatory damages in the amount of $2,016,000.00 to redress his loss of liberty, emotional distress, lost income and earning capacity, loss of familial relationships,

reputational harm, and other injuries described herein;

b. Punitive damages in the amount of $6,500,000.00 against Defendants Desiderio and the Estate of Judge Ribner to punish their extreme and outrageous misconduct and deter similar conduct in the future;

c. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law, should counsel later appear on his behalf;

d. Declaratory relief that Defendants' conduct violated his rights under the United States Constitution and Pennsylvania law; and

e. Injunctive and policy-reform relief requiring the City of Philadelphia to implement training, supervision, conflict-disclosure, and disciplinary mechanisms designed to prevent undisclosed judge–prosecutor conflicts, ensure compliance with Brady, and protect the integrity of jury-trial waivers.

## VIII. SUMMARY JUDGMENT AND IMMUNITY – ANTICIPATED ISSUES

110. Plaintiff anticipates that Defendants will move to dismiss and seek summary judgment based on Heck v. Humphrey, absolute judicial and prosecutorial immunity, qualified immunity, and state-law immunities. Plaintiff pleads the following to demonstrate why such motions should be denied.

111. First, Plaintiff's original first-degree murder conviction has been vacated. He accepted a later plea to third-degree murder solely to secure his release after decades in

prison. His claims attack the fairness and structural integrity of the vacated conviction; success on these claims does not necessarily imply the invalidity of the subsequent plea-based conviction, and thus Heck does not bar this suit.

112. Second, absolute immunity is function-specific. Many of the challenged acts—concealing conflicts, manipulating jury waivers, selectively disclosing relationships in some cases but not others—are administrative, investigative, or non-judicial acts not entitled to absolute immunity, particularly at the pleadings and summary-judgment stages where factual development is essential.

113. Third, the law was clearly established at the time of the underlying events that due process forbids a biased tribunal or even the appearance of impropriety, especially when a judge holds a financial or personal stake and fails to disclose it; that a jury-trial waiver must be knowing, voluntary, and intelligent; and that Brady obligations are mandatory. No reasonable judge or prosecutor could have believed it lawful to conceal a conflict disclosed in other cases or to manipulate a capital defendant's waiver under those conditions.

114. Fourth, any claim of state-law immunity must be evaluated against the egregious, intentional nature of the misconduct alleged. The facts, viewed in the light most favorable to Mr. Santiago, do not describe good-faith mistakes; they describe knowing violations of fundamental rights.

115. At a minimum, these issues present disputed questions of material fact that cannot be resolved as a matter of law and must be submitted to a jury.

## IX. PRAYER FOR RELIEF

**WHEREFORE, Plaintiff JOSE LOUIS SANTIAGO, proceeding pro se and maintaining his innocence, respectfully requests that this Court:**

**A. Enter judgment in his favor and against all Defendants on all counts;**

**B. Award compensatory damages in the amount of $2,016,000.00;**

**C. Award punitive damages in the amount of $6,500,000.00 against Defendants Desiderio and the Estate of Judge Ribner;**

**D. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision;**

**E. Declare that Defendants' conduct violated his rights under the United States Constitution and Pennsylvania law;**

**F. Order appropriate injunctive and policy-reform relief against the City of Philadelphia to ensure that no future defendant faces an undisclosed judge–prosecutor conflict, a manipulated jury-waiver colloquy, or a similar structural due-process violation; and**

**G. Grant such other and further relief as this Court deems just and proper.**

**Respectfully submitted,**

*Jose Luis Santiago*

Date: _12 - 03 -25_

JOSE LOUIS SANTIAGO

6425 Hegerman Street

Philadelphia, PA 19135

Plaintiff, pro se